**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO.

WOODBRIDGE STRUCTURED
FUNDING, LLC, a Delaware Limited
Liability Company, and WOODBRIDGE
GROUP OF COMPANIES, LLC, a
Delaware Limited Liability Company
         Plaintiffs,

vs.

ANDRES PINA, an individual; SHANOID
ANTHONY MAYS, a/k/a Anthony Mays,
an individual; JOSUE BENITEZ, an
individual; THE 314 INVESTMENTS, an
unknown California entity           /
         Defendants.

_____

**VERIFIED COMPLAINT**

Plaintiffs, WOODBRIDGE STRUCTURED FUNDING, LLC, a Delaware Limited

Liability Company, ("Woodbridge SF"), and WOODBRIDGE GROUP OF COMPANIES, LLC,

a Delaware Limited Liability Company, ("Woodbridge Group")(collectively Plaintiffs herein are

referred to as "Woodbridge"), hereby sue Defendants, ANDRES PINA, an individual ("Pina"),

SHANOID ANTHONY MAYS, a/k/a Anthony Mays, an individual ("Mays"), JOSUE

BENITEZ, an individual ("Benitez"), and THE 314 INVESTMENTS, an unknown California

entity.  Defendants stole Woodbridge confidential data and trade secrets, without authority

accessed Woodbridge's computers and its database and caused damage and harm to

Woodbridge, diverted Woodbridge customer transactions to competitors (sometimes with

fraudulent statements), interfered with actual and prospective Woodbridge customer relations

and breached Woodbridge employment agreements and post-employment agreements.

**Jurisdiction and Venue**

1.  This action seeks redress for violations of the Federal Computer Fraud and Abuse Act (CFAA), 18 U.S.C. sec. 1030 (Count 1); Florida's Computer Abuse and Data Recovery Act (CADRA), Fla. Stat. 668.801 (Count 2); California's Computer Crimes Act, Cal. Pen. Code § 502 (Count 3); the Federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1833 and 1836(b) (Count 4); Florida's Uniform Trade Secrets Act (Fl-USTA), Fla. Stat. 688.001 (Count 5); California's Uniform Trade Secrets Act (CA-UTSA), Cal. Civ. Code 3426.1 (Count 6); and seeks redress for Tortious Interference with Advantageous Business Relationship under Florida Common Law (Count 7); Intentional Interference with Prospective Economic Relationship under California Common Law (Count 8); Florida Common Law Fraud (Count 9); California Common Law Fraud (Count 10); Pina's Breach of Agreements with Woodbridge SF and Woodbridge Group (Count 11); Mays' Breach of Agreement with Woodbridge SF (Count 12); and Benitez' Breach of Agreements with Woodbridge SF (Count 13).

2.  This Court has original jurisdiction over civil actions arising under federal laws, 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1839(c)(original jurisdiction under the Federal Defend Trade Secrets Act) and supplemental jurisdiction over the state law and common law claims under 28 U.S.C. § 1367(a).

3.  Woodbridge Structured Funding, LLC ("Woodbridge SF") and its affiliate Woodbridge Group of Companies, LLC ("Woodbridge Group") (collectively herein "Woodbridge") own and operate a networked computer system which permits access to a Woodbridge database (herein the "Woodbridge Database"). Woodbridge computers are used in connection with structured settlement transactions for customers of Woodbridge who

reside throughout the United States and, as such, these Woodbridge settlement transactions and the use of the Woodbridge computer network and Woodbridge Database affects interstate commerce in the United States.

4.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims set forth in this complaint occurred in this judicial district and various contracts require that litigation be brought in this judicial district (Pina's October 2013 Agreement with Woodbridge SF (see Count 11) specifies venue in Palm Beach County, FL; Benitez' August 2012 Agreement with Woodbridge SF (see Count 13) specifies venue in Palm Beach County, FL and Benitez' October 2013 Agreement with Woodbridge SF confirms the venue from the earlier Agreement.

**The Parties**

5.   Plaintiff, Woodbridge Structured Funding, LLC ("Woodbridge SF"), is a Delaware limited liability company, engaged in the structured settlement business with an office in Boca Raton, Florida, and is authorized to do business in Florida. Woodbridge SF also has an office in Sherman Oaks, California and is authorized to do business in the State of California.

6.   Plaintiff, Woodbridge Group of Companies, LLC ("Woodbridge Group"), is a Delaware limited liability company having an office in Sherman Oaks, California. Woodbridge Group is authorized to do business in the State of California.  Among other financial businesses, Woodbridge Group is engaged in the structured settlement business.

7. Woodbridge SF is an affiliated company related to Woodbridge Group.

8. Upon information and belief, defendant Andrus Pina ("Pina") currently resides in Van Nuys, CA. Pina's current address is believed to be 13545 Leadwell Street, Van Nuys, CA 91405.

9. Prior to June, 2015, Pina resided in Boca Raton, Florida and, at that time, worked as an employee of Woodbridge SF.

10. Subsequent to June, 2015, Pina moved to Sherman Oaks, California. Pina resigned his Woodbridge management position in March, 2016.

11. Upon information and belief, Defendant Shanoid Anthony Mays ("Mays") currently resides in Granada Hills, CA. Mays' current address is believed to be 16760 Devonshire Street, Apt. 12, Granada Hills, CA 91344.

12. Mays worked as an employee of Woodbridge SF in Sherman Oaks, CA from October 2013 through March 2016.

13. Upon information and belief, Defendant Josue Benitez ("Benitez") resided in South Florida until 2016.  Benitez's current address is believed to be 11201 Chase St., Unit 2, Fulton, MD 20759.

14. From August 2012 through October 2013, Benitez worked as an employee of Woodbridge SF in its Boca Raton, FL office. During Benitez' employment, he lived in Greenacres, FL.

15. The "314 INVESTMENTS" Defendant is an unknown California entity owned and operated by Pina.  314 INVESTMENTS current address is believed to be c/o Pina at 13545 Leadwell Street, Van Nuys, CA 91405.

**Facts Relative to All Counts**

16. Woodbridge Group develops and provides various financial products to qualified investors throughout the United States. Woodbridge SF is affiliated with Woodbridge Group and, in general, is controlled by Woodbridge Group principals.

17. Woodbridge SF creates, provides and supplies structured settlement funding agreements to its customers.

18. The structured settlement business involves establishing a relationship between individuals who have legally binding judgments compelling third party payors to make payments on a periodic basis. Sometimes these individuals, who are identified herein as Woodbridge customers, seek advances on these periodic payment judgments. In general, Woodbridge SF provides advance payments to its customers, within the parameters of Court approved orders, and sells a structured settlement financial product to Woodbridge investors. These Woodbridge investors effectively fund advanced payments made to Woodbridge customers in accordance with court – approved orders. Stated otherwise, a court order approves the advance payments to Woodbridge customers and orders the third party payors to make payments to Woodbridge or its designees.

19. In this manner, Woodbridge's structured settlement business buys time-based settlement payment contracts from its customers, pays customers for those settlement contracts and resells re-structures settlement contracts to its investors.

**The Woodbridge Database**

20. In order to efficiently operate its structured settlement business, Woodbridge SF and its affiliate, Woodbridge Group, developed a comprehensive database (herein the

"Woodbridge Database") that includes vast amounts of information regarding
Woodbridge customers, prospective customers and investors.  This Database stores
confidential customer data, including, but not limited to: (a) personal identifying
information (PII)(such as name, address, Social Security number, driver's license
number, occupation, employer); (b) financial information including assets, income, credit
history, credit card data, bank account data; (c) legal information including judgments,
liens, bankruptcies, divorces, probate, civil and criminal records; (d) additional customer
information including date of birth, telephone numbers, email; ( e) insurance and annuity
information including policy terms and limits, beneficiaries, premiums, and payment
history; (f) medical information, including current health condition and prior medical
history and treatments; and (g) similar PII information and financial data about the
customer's spouse and children.

21. In addition to this data, the Woodbridge Database contains images (PDFs) of key
documents such as judgments, insurance policies, driver's licenses, and Social Security
cards.

22. To improve efficiency, Woodbridge automatically captures all emails between
Woodbridge employees and Woodbridge customers, and records telephone conversations
between its employees and customers (subject to approval by the customer).  These are
stored and cataloged in the Database.

23. Additionally, Woodbridge complies public records for existing and prospective
customers in its Database. These records, in addition to telephone call logs and electronic
inquiries from the Internet (via Woodbridge web portals), identify prospective
Woodbridge customers who are interested in the advance payment financial product

offered by Woodbridge.  Existing customers oftentimes periodically re-finance their structured settlements with Woodbridge.  The Woodbridge Database is used to predict a customer's interest in financing or refinancing his or her structured settlement.

24. As part of this analysis and data gathering event, Woodbridge SF obtains credit reports and social security numbers detailing the credit history of prospective Woodbridge and existing Woodbridge customer (subject to approval by the customer).

25. All this data in the Woodbridge Database represents highly confidential personal information of Woodbridge's existing customers and prospective customers.

26. In order to complete the funding cycle for its structured settlements business, the Woodbridge Database also includes contact data, contractual and financial data information for potential and actual investors who purchase the structured settlement contracts.

## Defendants' Employment

Benitez

27. On August 21, 2012, Josue Benitez was employed by Woodbridge SF in its Boca Raton, FL office.  Originally hired as a salesperson, Benitez was ultimately promoted to the position of Director of Business Development for Woodbridge SF in Boca Raton.

28. He supervised about ten (10) other Woodbridge SF employees in Boca Raton.

29. In August, 2012, Benitez signed a Confidentiality, Noncompetition and Nonsolicitation Agreement with Woodbridge SF. See Plaintiffs' Exhibit PX-01 (herein "PX-01"), attached. The August 2012 agreement provided that Benitez would not use trade secret and confidential information developed by or used in connection with Woodbridge SF'

business other than for the benefit of his employer.  Further, for a one (1) year period after his employment, he would not divert, attempt to divert, or solicit Woodbridge customers, prospective customers or employees away from Woodbridge, and he would not disclose, use or permit others to disclose or use Woodbridge trade secret or confidential information. In the event of a breach, contractual disputes would be resolved in Palm Beach County, Florida.

30. Benitez had access to the Woodbridge Database in order to fulfill his responsibilities at Woodbridge SF in Boca Raton, FL.

31. In his position as Director of Business Development, Benitez supervised Woodbridge employees and managed the Woodbridge structured settlement business, directed employees to gather information regarding Woodbridge customers and prospective customers throughout the United States and offered these customers advance payment plans commensurate with the structured settlement judgments.

32. Woodbridge SF has fulfilled all of its obligations under the Benitez August 2012 Confidentiality, Noncompetition and Nonsolicitation agreement.

33. On October 7, 2013, Benitez resigned from Woodbridge SF. At that time, Benitez signed a Woodbridge Structured Funding LLC Termination and Nonsolicitation Agreement. PX-02, attached.

34. In this October 2013 Termination Agreement, Benitez acknowledged that he had access to Woodbridge SF confidential information and trade secret information and that this information belonged exclusively to Woodbridge. The October 2013 contract included a nonsolicitation clause wherein Benitez agreed not to solicit any Woodbridge customer or prospective customer for one (1) year after October 7, 2013. The "prospective customer"

is broadly defined as any person who contacted Woodbridge for re-financing of the structured settlement.  Further, for five (5) years after his employment (until 2018), Benitez agreed not to interfere with the business of any Woodbridge entity or any Woodbridge employee.

35. The October 2013 Agreement also provided that Benitez would not disclose or use any confidential or trade secret information of any Woodbridge entity.

36. Although the Agreement contains an integration clause that "supersedes any and all prior agreements," the October 2013 Agreement expressly provided "that to the extent that it does not contradict anything contained in this agreement, the Confidentiality, Noncompetition and Nonsolicitation Agreement dated August 21, 2012… shall remain in effect as a valid and binding obligation of the parties." PX-02, page 8, section 17.

37. Woodbridge SF and Woodbridge Group have fully performed under the October 2013 Benitez agreement.

Pina

38. On October 23, 2013, Andreas Pina was hired by Woodbridge SF as the manager for the Boca Raton, FL office.

39. Pina and Woodbridge SF signed a Florida Confidentiality, Noncompetition and Nonsolicitation Agreement for Continuing Employees. PX-03, attached.

40. The October 2013 agreement provided that Pina, while an employee of Woodbridge, would not engage in any business similar to the structured settlement business of Woodbridge SF, would not act as an officer, director or employee of any competitor within 50 miles of the Boca Raton office, would not divert or attempt to divert prospective customers of Woodbridge, or induce others to do so. Additionally, Pina

agreed not to directly or indirectly solicit other Woodbridge employees to leave Woodbridge's employ.

41. With respect to confidential information, the October 2013 Agreement broadly identified Woodbridge confidential information and trade secret information. Pina agreed not to disclose or use Woodbridge's confidential information or trade secrets during his employment and for one (1) year period after his employment.

42. The Agreement also provided that all disputes with respect to the October 2013 Agreement would be resolved in Palm Beach County, Florida.

43. Woodbridge SF has fulfilled all of its obligations under the October 2013 Agreement.

Mays

44. On the same day that Pina was hired (October 23, 2013), Woodbridge SF hired Shanoid Anthony Mays ("Mays") in its Sherman Oaks, CA office.

45. Mays signed an October 2013 Agreement with Woodbridge SF entitled "California Confidentiality and Nondisclosure Agreement for Continuing Employees."  PX-04, attached.

46. The Mays Agreement broadly identifies Woodbridge confidential information and trade secret information. Mays agreed that while he was employed, and for a period of one (1) year after his employment, Mays would not communicate, publish, disclose or use such confidential information. Further, the Mays October 2013 Agreement provided that Mays would not engage in competitive activities in connection with such confidential information. The Agreement provides that contractual disputes would be resolved in Los Angeles, CA.

47. Woodbridge SF has fulfilled all of its obligations under the Mays October 2013 Agreement.

Pina's Managerial Responsibilities

48. While working at Woodbridge SF, Pina was viewed as a loyal and productive manager. He managed the entire Woodbridge structured settlement business first from the Boca Raton, FL office and later from the Sherman Oaks, CA office.  He had complete access to and control over the Woodbridge Database, its creation, development and data flow.

49. Pina was the individual in charge of the entire structured settlement department. All data, material and information flowed through him. Pina maintained, interpreted and reported business figures to Woodbridge principals. He allocated resources for marketing efforts, purchased additional research from third party data vendors as needed, selected new vendors and generally made ongoing decisions about the Woodbridge structured settlement division.

50. Pina assigned all work to Woodbridge personnel for the structured settlement department.  Pina had the responsibility and the authority to access virtually all of Woodbridge SF in Woodbridge Group records and Database including, but not limited to customer lists, budgets, division and allocation of resources, customer legal and transactional documents, customer financial information (including Social Security numbers and credit reports), investor financial information, investor legal and transactional documents, operating and overhead budgets and costs, accounts payable and accounts receivable.

51. Pina also had access to Woodbridge's raw data and statistical marketing data compiled both on a national and regional level, demographic analytics developed by Woodbridge, the current and future business plans of Woodbridge SF and Woodbridge Group, its strategies, forecasts, projections, internal and external communications, notes, calculations and files pertaining to prior, pending and potential customer accounts.

**Woodbridge Employees Resign**

52.  On June 1, 2015, Pina was appointed Woodbridge's Director of Sales and Research and was transferred to the Sherman Oaks, CA office.

53. As Director of Sales, Pina ran the entire Woodbridge structured settlement business with only high level guidance from Woodbridge principals.

54. The Woodbridge Database included all structured settlement customer accounts, files and information about customers who had re-financed their structured settlements and prospective clients who sought advice on such re-financing. The Database included all data and electronic paperwork and forms necessary to conduct a structured settlement business.

55. Mays' responsibilities as a salesman in the Sherman Oaks, CA office included contacting potential customers and negotiating structured settlement agreements. Mays was the primary Woodbridge contact for each customer and had authority to offer customer incentives to close structured settlement deals.  Mays handled much of the paperwork for these deals and was paid commissions for closed transactions.

56. On March 11, 2016, both Pina and Mays resigned.

57. On March 16, 2016, Pina signed an agreement titled "Confidential Separation Agreement and Release of All Claims" with Woodbridge Group. PX-05, attached.  The Agreement recognized that Pina ended his employment five (5) days earlier on March 11, provided for severance pay and included an acknowledgment that Woodbridge Group and Woodbridge SF fulfilled all of its obligations as his employer.

58. The March 2016 Pina Separation Agreement stated that Pina released Woodbridge Group and all corporate subsidiaries and affiliates, which included Woodbridge SF, as "Released Parties".

59. In the Separation Agreement, Pina acknowledged that he had returned all Woodbridge company property including all computers and electronic storage devices carrying electronically stored information.

60. Pina acknowledged that he had access to trade secrets and confidential information of the Released Parties, Woodbridge Group and Woodbridge SF.

61. This confidential information and trade secret information of the Released Parties is broadly identified and includes all information and data which is proprietary or confidential owned by the Released Parties.

62. Pina acknowledged that any disclosure of any trade secrets or confidential information owned by Released Parties would cause irreparable harm.

63. The Separation Agreement also included a post-employment non-solicitation obligation relative to Woodbridge Customers (defined as "clients" in the Agreement).   A "client" of a Released Party was any customer of Woodbridge during the five (5) year period prior to the March 2016 Pina resignation date and further included any individual who made an inquiry to any Released Party within a one (1) year prior to March 2016.

64. The Agreement required Pina not to solicit any such client of the Released Parties for a one (1) year post-employment period, and further not to induce any employee to leave the employment of the Released Parties or interfere with such relationship for a one (1) year post-employment period.  Additionally, Pina agreed not to induce or attempt to induce any such client to cease doing business with a Released Party or interfere with the relationships between Woodbridge and its consultants, contractors and third parties (such as Woodbridge investors) for a one (1) year post-employment period.

65. The Separation Agreement is governed by California law "and its terms <u>may</u> be enforced by a California court of competent jurisdiction." Therefore, venue in California for enforcement of the Separation Agreement is permissive, but is not required.

66. The Separation Agreement provides that the "agreement sets forth the complete agreement between the parties relating to the subject matter contained herein and supersedes any and all prior agreements or understandings."

67. Woodbridge Group and Woodbridge SF fulfilled all obligations under the Pina Separation Agreement.

**The Conspiracy**

68. Notwithstanding Pina's promotion and relocation to California in June 2015, he and Mays soon conspired to leave Woodbridge SF's employ.

69. After Pina and Mays left in March 2016, an investigation revealed that in November 2015, Pina told a Woodbridge receptionist's that he was leaving the company.

70. In November 2015, while employed at Woodbridge, Pina and Mays began to look for office space.  In December, Pina's appointment calendar lists a visit to new office space. In January 2016, Pina emailed an office rental application to Mays.  In February, Mays

searched online for a real estate broker, looked for available office space at specific addresses. On March 2, Mays forwarded to Pina's personal email a lease proposal, sent by a landlord to Mays's Woodbridge email address.  Mays sent a copy to his personal email <amays4dish@yahoo.com >.  Pina used is personal email <andrespina314@gmil.com >.   While employed, Pina established electrical service for the new Pina-Mays office at 18308 Sherman Way, Suite 6, Reseda, CA. Pina also scheduled a reminder on his Woodbridge calendar to pay the May 2016 rent on the new Pina-Mays office.

71. On February 10, Pina drafted and saved to his desktop computer a "hidden" document entitled "Resignation Letter," which draft letter was nearly identical to the letter he would later tender to Woodbridge on March 7.

72. On February 10, Mays used his Woodbridge computer to search the Internet in an "incognito mode" for answers to the query "when resigning, do I get paid for vacation time? CA."  The Incognito Mode program is an add-on to the GOOGLE CHROME Browser program which hides a person's Internet searches. The Incognito program was located on Mays' computer.

## Theft of Woodbridge's Database and Misuse of Data

73.  A week before tendering his resignation, Mays spent the day compiling a list of the contact information for Woodbridge competitors, and emailed that data to his private account.

74. On March 4, Mays emailed to himself links to Woodbridge's closest competitors, all of whom are in the business of purchasing bulk structured settlement "leads" and

prospective customer information. These Woodbridge competitors pay commissions for structured settlement referrals. Mays downloaded reports for all Woodbridge prospective customer leads and contacts using the CHROME browser in an Incognito Mode which partly hid his searches through the Woodbridge database. Woodbridge uses a CHROME browser to access data in its comprehensive Database.

75. Mays hid this theft of Woodbridge Database data by erasing stolen downloaded files, using the CHROME Incognito Mode. On the day Mays resigned (March 11), he searched the Woodbridge Database and downloaded structured settlement lead files.

76. As for Pina and Benitez, Woodbridge records show that Pina was funneling prospective structured settlement customers to Benitez using data from the Woodbridge Database.

77. Pina gave Woodbridge four (4) days notice on March 7 and resigned on March 11. See PX-05.

78. On March 7 in an email exchange, Pina was asked by a Woodbridge principal "can we [Woodbridge] count on you not to take the database with you, or have you already copied it." Pina replied that he would not take the Woodbridge Database nor steal the data. He said "I would not take the database and if SS [structured settlement] is the direction I decide to go, I have the experience and knowledge to create it myself".

79. This statement by Pina was a promise that (a) he agreed not to copy the Database and (b) he acknowledged that his rights to use the data in the Database had been terminated by his resignation from Woodbridge.

80. At the same time Pina promised not to steal Woodbridge's Database, he was uploading the Database into a private Dropbox account from his Woodbridge computer. The

Database was so large that it took Pina's computer hours to complete this Database theft and caused his computer to crash at least twice due to overloading and overheating.

81.  When Pina and Mays resigned on March 7 (effective March 11, see PX-05), Woodbridge had no knowledge of these disloyal acts by Pina, Mays and Benitez.  Although Woodbridge had no further obligations to Pina, in consideration of his agreement to: "cooperat[e]," "return [] property," not to use Woodbridge's "confidential and proprietary information," maintain the same in a confidential manner, not to "solicit" Woodbridge customers and employees and not to "disparage" the companies, Woodbridge Group and Woodbridge SF gave Pina eight (8) week's severance pay.  See PX- 03, attached.

82. After Pina and Mays left Woodbridge's employ, an investigation revealed a pattern of disloyal and illegal actions by Pina, Mays and Benitez. The timing, scope and depth of the Pina-Mays-Benitez conspiracy included theft of Woodbridge data, diversion of business of Woodbridge customers who had previously re-financed with the company, diversion of prospective business, theft of data services from Woodbridge vendors and other contractual and illegal acts by Defendants.

[page left blank]

**83.** The conspiracy's financial impact on Woodbridge is shown graphically below. The Average Number of Structured Settlement ("SS") Deals Closed Per Month (Average Monthly Deals) by Woodbridge was:



**Documented Customer Data Thefts – Customers Stanfield and Castro**

<u>Stanfield</u>

**84.** Woodbridge began its investigation after a former customer, L. Stanfield, called its office and described a diverted transaction.

**85.** On January 28, 2016, L. Stanfield, an established Woodbridge customer who had earlier re-financed her structured settlement, called Pina regarding a new transaction; however, no information about this call was logged in Woodbridge's Database. Woodbridge's system records phone calls (with the caller's permission) and Woodbridge has a recording of Stanfield's call.

**86.** During the Stanfield-Pina call Pina created a spreadsheet titled "stanfield," and saved the file to his Woodbridge desktop computer.

87. Over the course of the next few days, Pina took at least two more calls from Stanfield regarding the proposed transaction. In these conversations, Pina told Stanfield that a $500 advance was approved for her and was being delivered to her by Western Union.  These two (2) calls were recorded.

88. On February 11, Pina accessed multiple files in Woodbridge's database concerning Stanfield, even though no active or pending Woodbridge deals existed at that time.

89. Pina diverted the Stanfield transaction to a Woodbridge competitor using Woodbridge data.  First, there was no legitimate reason for Pina to access Stanfield's file. Second, Pina did not enter any information or notes into Stanfield's records in the Woodbridge Database. Third, there was no documented explanation as to why Pina accessed the Database for Stanfield's earlier Woodbridge deals. Fourth, Pina used Woodbridge's data, Database and its resources to benefit a competitor while collecting a salary and being employed by Woodbridge.

90. On February 15, Pina received an email from Western Union with information about a "new" account.

91. Woodbridge does not have a Western Union account and does not use Western Union for to advance funds to its customers.

92. On February 16, a Woodbridge competitor, Legacy One, filed a petition in the California State court for the approval of proposed transfer of structured settlement payments for L. Stanfield. Legacy One is a direct competitor of Woodbridge SF and Woodbridge Group.

93. Upon information and belief, Benitez is either an owner or officer of Legacy One, or is employed by Legacy One or is associated with Legacy One and receives commissions for re-financed structured settlement deals.

94. Pina fraudulently misrepresented to Stanfield that he was working on behalf of Woodbridge in this transaction. He misrepresented to Stanfield that Woodbridge was making the cash advance through Western Union when, in fact, he personally advanced money to Stanfield.

95. On March 30, three (3) weeks after Pina's resignation, the company received a call from Stanfield regarding the transaction. Woodbridge informed Stanfield that it had no record of any transaction. This call was recorded by Woodbridge.

96. During the follow-on investigation, Stanfield told investigators that she believed that she was doing business with Woodbridge. Woodbridge recorded this follow-up call.

97. After the March 30 phone call, Pina admitted to Woodbridge's management that he referred and processed the Stanfield settlement transaction to competitor Legacy One. Pina admitted to Woodbridge's management that he set up this account in order to wire Stanfield a $500 advance using his private funds. Pina also explained that once the deal closed and was funded, the competitor would pay both his commission and reimburse the $500 advance.

98. Benitez, on a conference call with Woodbridge's management, admitted knowing that the Stanfield deal was a Woodbridge deal.

99. Benitez was referred customers by Pina/Mays, then Woodbridge employees, in exchange for commissions paid directly to Pina/Mays in their personal capacity. Benitez must have known that the Stanfield data was stolen from Woodbridge and the Stanfield deal was diverted away from Woodbridge because Pina personally wired a $500 advance to Stanfield on behalf of Benitez' employer/principal, Legacy One. This $500 advance

payment must have been accounted for by Benitez' employer/principal, Legacy One, in connection with future payments to Stanfield.

100.     Upon information and belief, Pina, Mays and Benitez profited from the 2016 Stanfield deal by receiving commissions from the deal.

Castro

101.     Regarding another documented event involving customer R. Castro, Pina and Mays diverted Woodbridge customer Castro to a competitor because there is no record in the Woodbridge Database about any potential deal, contact, communication, or offer in 2016.

102.     Castro's most recent entry in the Woodbridge Database was September 25, 2015 when Woodbridge funded the second of two (2) Castro deals that Pina and Mays worked on.

103.     On January 18, Castro called Woodbridge and spoke with Mays. They discussed transactional options for a potential $30,000 deal, divided between two annuities. Mays ended the call saying he would draft some options for Castro with different net pay-out figures.

104.     During the next few weeks, Mays and Castro exchanged emails concerning proposed Castro deal terms.

105.     On January 28, Mays created (i) a WordPerfect document titled "Prudential" [the insurance company]; (ii) an Excel spread sheet titled "Castro – Prudential"; and (iii) an Excel spreadsheet titled "Castro – Pacific Life" another insurance company.

106.     Mays subsequently deleted these Castro documents from his Woodridge computer. Woodbridge does not know the content of those documents since Mays deleted them.

107.     For the next few weeks until February 17, Mays regularly accessed, reviewed, and downloaded documents from Castro's earlier two (2) deals from the Woodbridge Database records.

108.     On February 17, a transfer petition was filed in California State court by Woodbridge's competitor, Legacy One, LLC , seeking approval of a transfer by Castro of his rights to receive payments under "two separate annuity contracts; one with Pacific Life & Annuity Company and one with Prudential Insurance Company of America."

109.     The Castro Transfer Petition provides that: (a) the Petition seeks a transfer on the same terms as those discussed in the Castro-Mays recording (which Pina supervised); (b) the exhibits attached to the Petition are duplicates of documents from Woodbridge's Database; (c) the exhibits to the Petition bear Woodbridge's fax number in the header; (d) these Petition exhibits were months earlier faxed to Woodbridge and the faxed documents are not publicly available; and ( e) the only person who accessed and downloaded those files since September 25, 2015 was Mays and potentially Pina.

110.     There is nothing in Woodbridge's Database about the 2016 Castro-Mays-Pina deal closed by Legacy One.

111.     Mays downloaded Woodbridge documents the company had received during two previous Castro settlement deals.  Woodbridge had no other record of any other possible leads or deals pertaining to this third Castro structured settlement deal.

112.     On April 6, a nearly month after Mays quit, Woodbridge received a misdirected fax addressed to Mays from Castro. The misdirected fax consisted of two incomplete signature pages for the transfer contract between Castro and Legacy One, and another Woodbridge competitor, Sutton Park.

113.     Mays and Pina used Woodbridge's confidential data and trade secret files on Castro and diverted the Castro structured settlement deal to Woodbridge competitors by: (a) not informing Woodbridge of the 2016 Castro deal; (b) not entering appropriate information in the Woodbridge Database; (c) knowingly concealing the existence of the potential Castro deal; and (d) upon information and belief, profiting from the 2016 Castro deal by receiving commissions from the deal.

114.     Mays' actions relative to the 2016 Castro deal were mainly conducted while Mays was employed by Woodbridge.

115.     Benitez knew or should have known that the 2016 Castro deal involved theft of Woodbridge data which resulted in diversion of customer Castro by employee Mays because (a) the 2016 Castro deal was closed by Legacy One (Benitez' employer or principal); (b) the above-noted documents from Mays were critical to close the 2016 Castro deal; and (c) an exhibit to the Castro Petition listed Woodbridge's fax number and shows a Woodbridge employee's name (Pena) on the header of the fax.

116.     Woodbridge continues to locate other cases of customer diversion, data theft and illegal acts by Pina, Mays and Benitez.

### Woodbridge's Florida Customers

117.     From August 2012 to October 2013, Benitez worked exclusively in the Woodbridge Boca Raton, FL office.

118.     From October 2013 to June 2015, Pina worked exclusively in the Woodbridge Boca Raton, FL office.  Thereafter, he moved to the Sherman Oaks, CA Woodbridge office, until he resigned in March 2016.

119.     Mays always worked in the Sherman Oaks, CA Woodbridge office until he resigned in March 2016.

120.     The Woodbridge Database was physically located in the Boca Raton, FL office until about December 2015.  Thereafter, it was migrated to the Sherman Oaks, CA Office.

121.     Woodbridge customer N. Dawkins is a resident of Boynton Beach, FL.  On January 21, 2016, Pina accessed the Woodbridge Database for Dawkins records.  The Woodbridge Database contains court records dated February 10 and March 4 for Dawkins and shows a structured settlement transaction with Woodbridge competitors, Legacy One LLC and SuttonPark Settlements LLC.  On March 9, Pina accessed the Woodbridge Database for Dawkins data.

122.     On March 9, Pina used Woodbridge data vendor LEXIS to access data regarding Woodbridge customers Dawkins, Bennett and Castro.  On March 10, Pina searched the Lexis database for Dawkins settlement data.  Generally in that time frame, Pina used his computer to search for Woodbridge competitor Legacy One in connection with customer

Dawkins.  Court papers document that Dawkins re-financed his structured settlement with Legacy One.

### Using False Credentials and Other Post-Employment Acts

123.     On April 9 after Pina resigned, Woodbridge records show that Pina, without authorization, accessed Woodbridge's credit report data vendor (TLO, TransUnion) and obtained credit report data and social security numbers for various Woodbridge customers and prospective customers.

124.     Pina used false credentials (either false user names and/or re-set passwords) to access this highly secure TLO credit report database.  Upon information and belief, Pina obtained credit reports for numerous Florida residents during this theft of computer data services and vendor data.  Woodbridge was charged for these data reports by its vendor(s).

125.     On April 26, Pina emailed to his "314" gmail account <the314investments@gmail.com> an EXCEL file, namely Book2 2015.xlsx.  This EXCEL spreadsheet listed 100 potential Woodbridge customer leads.  The spreadsheet listed nearly 50 Florida residents with structured settlements.

126.     On April 19, 2016, Pina without authorization, used Woodbridge's LEXIS account to locate, via CourtLink, Florida resident data on H. Patterson and competitor Uber Funding LLC. The Woodbridge Database has a record for H. Patterson from an earlier June 2015 transaction.

127.     On April 19, 2016, Pina again used Woodbridge's LEXIS account to locate, via CourtLink, data on Florida resident T. Mack and Uber Funding. The Woodbridge Database had T. Mack data from an earlier September 2015 transaction.

128.     Prior to his resignation in March 2016, Pina downloaded customer records for Woodbridge customer Bennet.  Nearly one month after he resigned, without authorization, he used the Woodbridge's LEXIS account and the CourtLink database to obtain structured settlement data on Florida resident Bennet.

129.     Prior to his resignation in March 2016, Pina downloaded customer records for Woodbridge customer M. Castro. Nearly three (3) months later on June 3, Pina without authorization used Woodbridge's LEXIS account and the CourtLink database to access data on Florida resident M. Castro.

130.     Woodbridge records show other potential Florida customer data thefts as follows. September 21, 2015: Pina obtained confidential data on Florida resident Marco.  October 19, 2015: Pina obtained Florida resident Blanco data from Woodbridge Database. October 19, 2015: Pina obtained Florida resident Dungan data from the Database. September 22, 2015: Pina obtained Florida resident Avery's data.  Pina accessed Woodbridge vendor database and obtained Florida resident Sherman's Settlement Order. Pina also accessed data for Woodbridge Florida customer Welch.

131.     Pina used and is using false credentials (user name and/or passwords) to access Woodbridge vendor databases and engage in theft of data services. On June 1, Pina accessed Woodbridge vendor LEXIS' database using, without authority, a false user name (<mpollock@gmail.com>).  Upon information and belief, Pina has re-set password(s) for the LEXIS account. Woodbridge was charged for these data services and data reports in connection with Florida resident data and non-Florida resident data by Woodbridge's data vendor(s).

132.     After Pina resigned on March 11 (see PX-04), he accessed the Woodbridge email system and deleted a number of incriminating emails to cover his tracks.  Pina's computer records chronologically show: On March 10, three (3) days after he gave notice of resignation, Pina deleted the email about the LA Water and Power Department providing electrical service to the new Pina-Mays office. On March 30, Pina deleted structured settlement documents from his Woodbridge email account.  On April 26, Pina deleted structured settlement search documents from his email.  On May 2, Pina deleted a reminder to call back a customer located in South Florida (a 305 area code).  On May 3, Pina deleted an emails to his "314" gmail account.

133.     Upon information and belief, Pina is using investor data from the copied Woodbridge Database in an effort to sell re-financed structured settlement contracts.  The Woodbridge Database copied into DropBox by Pina listed many Woodbridge Investors.

134.     Woodbridge SF, and its affiliate Woodbridge Group, developed algorithms used to prepare sales packages for investors which account for customer-associated risks, investor return on investment (ROI), investor revenues and payment dates.  These algorithms are trade secrets belonging to Woodbridge SF, and it affiliate Woodbridge Group.

135.     Upon information and belief, Pina is using Woodbridge investment algorithms without approval or authority from Plaintiffs.

136.     Woodbridge SF and Woodbridge Group have been damaged and have suffered losses by these actions of Pina, Mays and Benitez due to lost transaction fees for Woodbridge customers and prospective customers, data remediation costs, lost commissions and unauthorized charges for data services.

137.     Woodbridge has incurred remediation expenses and suffered related losses due the unauthorized access, use and copying of the Woodbridge Database and the data therein.

138.     Woodbridge SF and Woodbridge Group have paid for data services that were not associated with Woodbridge structured settlement transactions but that were ordered and delivered to Pina after his resignation. Upon information and belief, Pina, Mays and Benitez profited from the use of these purloined data services.

139.     The amount of Woodbridge SF and Woodbridge Group damages and losses cannot be reasonably ascertained.

140.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina, Mays and Benitez.


### Count 1: Violation of the Federal Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, by Pina and Mays

141.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set forth herein.

142.     Woodbridge SF and Woodbridge Group have suffered damage and loss due to the acts of Pina and Mays in violation of the CFAA and such damage and loss to Woodbridge SF and Woodbridge Group exceeds $5,000.

143.     Woodbridge SF and its affiliate Woodbridge Group own or lease and operate networked computers which access the Woodbridge Database on a computer server and these Woodbridge computers are used in connection with structured settlement transactions that affect interstate commerce in the United States.  These Woodbridge

computers are password protected and the passwords restrict access to data stored in the networked computers. The Woodbridge Database resides on a server accessed via the password protected Woodbridge computer network.

144.    Pina and Mays intentionally accessed the Woodbridge Database without authorization or accessed the Woodbridge Database and exceeded their respective authorizations and obtained protected computer data specified hereinabove, including, but not limited to, (a) financial records of Woodbridge customers and Woodbridge prospective customers which included consumer credit reports from a credit reporting agency; (b) medical data about those customers and prospective customers; and (c) other personal data, all in violation of CFAA § 1030(a)(2).

145.    Pina and Mays knowingly and with intent to defraud accessed the Woodbridge Database without authorization or accessed the Woodbridge Database and exceeded their respective authorizations, and by means of such actions, defrauded and intended to defraud Woodbridge SF and Woodbridge Group.  By these actions, Pina and Mays violated CFAA § 1030(a)(4).

146.    Upon information and belief, Pina and Mays obtained commissions or other compensation for structured settlement agreements as a result of the aforementioned unauthorized access to Woodbridge Database.

147.    Pina and Mays knowingly caused the transmission of a program, code or command and as a result of such conduct, intentionally deleted information from their respective Woodbridge computers without authorization.

148.    By deleting data on their respective Woodbridge computers, Pina and Mays intentionally accessed those protected Woodbridge computers and the Database without

authorization or exceeded their respective authorizations and such acts resulted in damage and loss to Woodbridge in connection with one or more Woodbridge customers and Woodbridge prospective customers.  By such actions, Pina and Mays violated CFAA § 1030(a)(5)(A) and (a)(5)(B).

149.     Pina knowingly and with intent to defraud trafficked in a password or similar information through which Pina gained access to one or more Woodbridge vendor computers. Woodbridge suffered loss and damage by being required to pay for such data services from the Woodbridge data vendors. Such action by Pina was without authorization. The use of an unauthorized password to access Woodbridge vendor databases involves trafficking of the password in interstate commerce.  By such actions, Pina violated CFAA § 1030(a)(6).

150.     Upon information and belief, Woodbridge SF and Woodbridge Group have suffered loss and have been damaged in excess of $5,000.

151.     The unauthorized copying by Pina of the Woodbridge Database, which includes (a) highly confidential medical information about Woodbridge customers and Woodbridge prospective customers and (b) extensive credit reports and financial data for Woodbridge customers and Woodbridge prospective customers, represents a threat to public safety and health.  The sharing of such data with third parties by Pina and Mays also represents a threat to public safety and health.  By these acts, Pina and Mays have violated CFAA § 1030(c)(4)(A)(IV).

152.     Woodbridge SF and Woodbridge Group have been damaged, have suffered losses, have incurred loss due to their remediation efforts based upon these actions by Pina and Mays.

153.    The full amount of damages and losses cannot be reasonably ascertained.

154.    Woodbridge SF and Woodbridge Group have been irreparably harmed by these

actions of Pina and Mays.

### Count 2: Violations of Florida's Computer Abuse and Data Recovery Act (CADRA), Fla. Stat. 668.801 (Count II) by Pina

155.    Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set

forth herein.

156.    Woodbridge SF and Woodbridge Group own or lease and operate networked

computers which access the Woodbridge Database on a computer server and these

Woodbridge computers are used in connection with structured settlement transactions in

connection with residents in the State of Florida. These Woodbridge computers are

password protected and the passwords restrict access to data stored in the Woodbridge

Database.

157.    After Pina resigned on March 11, 2016, he was no longer authorized to access the

Woodbridge Database. He also was no longer authorized to access the Woodbridge email

system and the Woodbridge networked computers.

158.    Pina knowingly and with an intent to cause harm or loss to Woodbridge SF and

Woodbridge Group, obtained information from the Woodbridge Database and the

Woodbridge networked computers without authorization and, as a result, caused harm or

loss to Woodbridge. Upon information and belief, Pina obtained data regarding Florida

residents when he was no longer authorized to access the Woodbridge Database and the

Woodbridge networked computers when the Database was located in Boca Raton, FL. By these actions subsequent to October 1, 2015, Pina violated CADRA § 668.803(1).

159.     Woodbridge SF and Woodbridge Group have suffered damages and losses, incurred remediation expenses, have suffered lost profits and economic damages. Upon information and belief, Pina has profited by these actions.

160.     The amount of damages and losses cannot be reasonably ascertained.

161.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina.

## Count 3: Civil Violations of California's Computer Crimes Act, Cal. Pen. Code § 502 by Pina

162.      Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set forth herein.

163.     Woodbridge SF and Woodbridge Group own or lease and operate networked computers which access the Woodbridge Database on a computer server and these Woodbridge computers are used in connection with structured settlement transactions in connection with residents in the State of California. These Woodbridge computers are password protected and the passwords restrict access to data stored in the networked computers, including data in the Woodbridge Database.

164.     Pina knowingly accessed and without permission altered, deleted and destroyed data on Woodbridge computers to defraud and deceive his employer in violation of Cal. Pen. Code § 502( c) (1).

165.     Pina knowingly accessed and without permission used data on Woodbridge computers and in the Woodbridge Database to defraud and deceive his employer in violation of Cal. Pen. Code § 502( c) (1).

166.     Pina knowingly accessed and without permission used data on Woodbridge computers and the Woodbridge Database to wrongfully obtain money during his employment and after his employment in violation of Cal. Pen. Code § 502( c) (1).

167.     Pina knowingly accessed and without permission copied and used data from Woodbridge computers and its Database in violation of Cal. Pen. Code § 502( c) (2).

168.     Pina knowingly and without permission used computer services from Woodbridge data vendors without authorization after he resigned from his employment with Woodbridge in violation of Cal. Pen. Code § 502( c) (3).

169.     Pina knowingly accessed and without permission altered, damaged and deleted and destroyed data on Woodbridge computers during his employment in violation of Cal. Pen. Code § 502( c) (4).

170.     Pina's actions are violations of Cal. Pen. Code § 502(c) and have been willful and fraudulent.

171.     Pina's actions complained of herein were not committed within the scope of his employment nor were these acts reasonably necessary to the performance of his employment with Woodbridge.

172.     Woodbridge SF and Woodbridge Group have been damaged and have suffered and incurred losses in connection with their remediation and verification efforts due to these actions by Pina.

173.     The amount of damages suffered by the theft of data services from Woodbridge
vendors exceeds $250.

174.     The amount of damages and losses cannot be reasonably ascertained.

175.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these
actions of Pina and Mays.

**Count 4: Violations of the Federal Defend Trade Secrets Act (DTSA),
18 U.S.C. § 1833 and 1836(b) by Pina, Mays and Benitez**

176.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set
forth herein.

177.      Woodbridge SF and Woodbridge Group own or lease and operate networked
computers which access the Woodbridge Database on its computer server and these
Woodbridge computers and Database are used in connection with structured settlement
transactions in interstate commerce.  Woodbridge customers and Woodbridge prospective
customers throughout the United States and in the State of Florida use interstate
commerce communications networks to communicate with Woodbridge's employees and
Woodbridge computers in connection with its structured settlement business. These
Woodbridge computers and Database are password protected and the passwords restrict
access to data stored therein.

178.     In March, 2016, without authorization, Pina copied, uploaded and stole the entire
Woodbridge Database through a private Dropbox account from his Woodbridge
computer. The Database was so large that it took Pina's computer hours to complete the

Database theft, causing his computer to crash at least twice due to overloading and overheating.

179.      Civil actions under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b) were permitted as of the effective date of the DTSA, that is, as of May 11, 2016.

180.      Pina, Mays and Benitez had contractual obligations to Plaintiffs not to use Woodbridge's confidential information and Woodbridge's trade secrets.

181.      Upon information and belief after May 11, Pina used and is using data and information from the copied Woodbridge Database.

182.      Upon information and belief after May 11, Mays knew or should have known that one or more structured settlement referrals from Pina originated based upon data and information in the Woodbridge copied database in the possession of Pina.

183.      Upon information and belief after May 11, Benitez knew or should have known that one or more structured settlement referrals from Pina originated based upon data and information in the Woodbridge copied database in the possession of Pina.

184.      Pina, Mays and Benitez all signed various contracts confirming that Woodbridge SF and Woodbridge Group own confidential information and trade secret information and data that is valuable business information used in connection with the Woodbridge structured settlement business.  PX 01, PX 02, PX 03, PX 04, PX 05.

185.      When Pina and Benitez left the employ of Woodbridge, Pina and Benitez in the Separation Agreement and the Termination Agreement acknowledged that Woodbridge SF and Woodbridge Group own confidential information and trade secrets that are valuable business information used in connection with the Woodbridge structured settlement business.

186.    Further, Pina, Mays and Benitez all contractually agreed to maintain and keep confidential Woodbridge's confidential information and trade secret information after they left its employ.

187.    The information in the Woodbridge Database has independent economic value from not being generally known to and not being readily ascertainable through proper means by others.  Access to the Woodbridge Database is restricted by password controls.

188.    Upon information and belief after May 11, Pina was disclosing and continues to disclose data and information from the copied Woodbridge Database to others including Mays and Benitez in violation of DTSA § 1839(5)(B) and 1832(a)(3) and (a)(5).

189.    Upon information and belief after May 11, Mays and Benitez was using and continues to are use data and information supplied by Pina from the copied Woodbridge Database in violation of DTSA § 1839(5)(B) and 1832(a)(3) and (a)(5).

190.    Upon information and belief after May 11, Mays and Benitez either knew or should have had reason to know that the data and information sent by Pina to them originated from the copied Woodbridge Database in violation of DTSA § 1839(5)(B) and 1832(a)(3) and (a)(5).

191.    Pina and Mays have an obligation to maintain the secrecy of the data and information in the Woodbridge Database in accordance with the contracts with Plaintiffs.

192.    Pina and Mays have violated their obligations to maintain the confidentiality of the data and information in the Woodbridge Database in accordance with the contracts signed by Pina and Mays.

193.    The use of the stolen  Woodbridge Database by Pina is willful and malicious because Pina willfully and maliciously copied the Woodbridge Database because (a)

when he was copying the Database, he promised that he would not take or copy the Database; and (b) effectively at the same time he copied the Database, Pina signed the March 16 Separation Agreement wherein he acknowledged the ownership and trade secret status of the Database and agreed not to disclose or use the Database after his employment with Woodbridge.

194.     Woodbridge SF and Woodbridge Group have been damaged and have suffered losses due to these actions by Pina, Mays and Benitez.

195.     The amount of damages and loss cannot be reasonably ascertained.

196.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina and Mays and Benitez.

### Count 5: Violations of Florida's Uniform Trade Secrets Act (Fl-USTA), Fla. Stat. 688.001 by Pina, Mays and Benitez

197.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set forth herein.

198.     Woodbridge SF and Woodbridge Group own or lease and operate networked computers which access the Woodbridge Database on its computer server and these Woodbridge computers are used in connection with structured settlement transactions in interstate commerce and in the State of Florida.  Woodbridge customers and Woodbridge prospective customers throughout the United States and in the State of Florida use communications networks to communicate with Woodbridge's computers in connection with the Woodbridge structured settlement business. These Woodbridge computers are

password protected and the passwords restrict access to data stored in the Woodbridge Database.

199.     During the period when Pina, Mays and Benitez were employed by Woodbridge and until about December 2015, the Woodbridge Database was physically located in Boca Raton, FL.  Woodbridge employees would access the Database via interstate communications networks.

200.     Before his resignation in March 2016, without authorization, Pina used data and information from the Woodbridge Database to (a) divert structured settlement transactions to companies other than his employer, (b) share information with Benitez, and (c) obtain commissions and other remuneration from Woodbridge competitors using the Woodbridge Database.

201.     In March, 2016, without authorization, Pina copied, uploaded and stole the entire Woodbridge Database through a private Dropbox account from his Woodbridge computer.

202.     Upon information and belief, Pina used data and information from the Woodbridge Database prior to December 2015 and was and is still using data and information from the Woodbridge Database.

203.     Upon information and belief, Mays knew or should have known that one or more structured settlement referrals from Pina was based upon data and information stolen from the Woodbridge Database.

204.     Upon information and belief, Benitez knew or should have known that one or more structured settlement referrals from Pina originated based upon data and information in the Woodbridge Database.

205.     Pina, Mays and Benitez signed various contracts confirming that Woodbridge SF and Woodbridge Group owns confidential information as well as trade secret information and data that is valuable business information used in connection with the Woodbridge structured settlement business.

206.     When Pina and Benitez left the employ of Woodbridge, Pina and Benitez in the Separation Agreement and the Termination Agreement acknowledged that Woodbridge SF and Woodbridge Group own confidential information and trade secrets that are valuable business information used in connection with the Woodbridge structured settlement business.

207.     Further, Pina, Mays and Benitez contractually agreed to maintain and keep confidential Woodbridge's confidential information and trade secret information after they left Woodbridge's employment.

208.     Information in the Woodbridge Database has independent economic value from not being generally known to and not being readily ascertainable through proper means by others.

209.     Pina was and currently is disclosing data and information from the Woodbridge Database to others, including Mays and Benitez, in violation of FL-UTSA.

210.     Pina was and currently is using data and information from the Woodbridge Database in violation of FL-UTSA.

211.     Upon information and belief, Mays and Benitez either knew or should have had reason to know that the data and information sent by Pina to them originated from the Woodbridge Database in violation of FL-UTSA.

212.     Pina and Mays have an obligation to maintain the secrecy of the data and information in the Woodbridge Database in accordance with the contracts with Plaintiffs.

213.     Pina and Mays have violated their obligation to maintain the confidentiality of the data and information in the Woodbridge Database in accordance with these contracts.

214.     The use of the Woodbridge Database by Pina was and is willful and malicious because Pina willfully and maliciously used the Woodbridge Database and profited off the use of Woodbridge data with respect to structured settlement deals with Woodbridge competitors.

215.     Woodbridge SF and Woodbridge Group have been damaged and have suffered losses due to these actions by Pina, Mays and Benitez.

216.     The amount of damages and loss cannot be reasonably ascertained.

217.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina and Mays and Benitez.

**Count 6: Violations of California's Uniform Trade Secrets Act (CA-UTSA), Cal. Civ. Code 3426.1 by Pina, Mays and Benitez**

218.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set forth herein.

219.     Woodbridge SF and Woodbridge Group own or lease and operate networked computers which access the Woodbridge Database on its computer server and these Woodbridge computers are used in connection with structured settlement transactions in interstate commerce and in California. Woodbridge customers and prospective customers

in California use communications networks to communicate with Woodbridge's computers in connection with the Woodbridge structured settlement business. These Woodbridge computers are password protected and the passwords restrict access to the Woodbridge Database.

220.     During their employment with Woodbridge at the Sherman Oaks Office, Pina and Mays accessed the Woodbridge Database initially located in Boca Raton, FL and, after December 2015, accessed the Woodbridge Database in the Sherman Oaks, CA Office.

221.     Before his resignation in March 2016, without authorization, Pina used data and information from the Woodbridge Database to (a) divert structured settlement transactions to companies other than his employer, (b) share information with Benitez, and (c) obtain commissions and other remuneration from Woodbridge competitors using the Woodbridge Database.

222.     In March 2016, without authorization, Pina copied, uploaded and stole the entire Woodbridge Database through a private Dropbox account from his Woodbridge computer.

223.     Pina used data and information from the Woodbridge Database and is still using data and information from the Woodbridge Database.

224.     Mays knew or should have known that structured settlement transactions from Pina used data and information from the Woodbridge Database.

225.     Upon information and belief, Benitez knew or should have known that structured settlement transactions from Pina used data and information from the Woodbridge Database.

41

226.     Pina, Mays and Benitez as all signed various contracts confirming that
Woodbridge SF and Woodbridge Group own confidential information as well as trade
secret information and data that is valuable business information used in connection with
the Woodbridge structured settlement business.

227.     When Pina and Benitez left Woodbridge, Pina and Benitez signed the Separation
Agreement and the Termination Agreement and acknowledged that Woodbridge owns
confidential information and trade secrets that represent valuable business information
used in connection with the Woodbridge structured settlement business.

228.     Further, Pina, Mays and Benitez all contractually agreed to maintain and keep
confidential Woodbridge's confidential information and trade secret information after
they left Woodbridge's employment.

229.     Information and data in the Woodbridge Database has independent economic
value from not being generally known to others and not being readily ascertainable
through proper means by others.

230.     Pina was and currently is disclosing data and information from the Woodbridge
Database to others including Mays and Benitez in violation of the CA-UTSA.

231.     Pina was and currently is using data and information from the Woodbridge
Database in violation of CA-UTSA.

232.     Upon information and belief, Mays and Benitez either knew or should have
reason to know that the data and information sent by Pina to them originated from the
Woodbridge Database in violation of CA-UTSA.

233.     Pina and Mays have an obligation to maintain the secrecy of the data and
information in the Woodbridge Database in accordance with the contracts with Plaintiffs.

234.     Pina and Mays have violated their contractual obligation to maintain the confidentiality of the data and information in the Woodbridge Database.

235.     The use of the Woodbridge Database by Pina was and is willful and malicious because Pina willfully and maliciously used the Woodbridge Database by profiting from the use of Woodbridge data and diverting structured settlement deals to Woodbridge competitors.

236.     Woodbridge SF and Woodbridge Group have been damaged and have suffered losses due to these actions by Pina, Mays and Benitez.

237.     The amount of damage and loss cannot be reasonably ascertained.

238.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina and Mays and Benitez.

### Count 7: Tortious Interference with Advantageous Business Relationship under Florida Common Law by Pina, Mays and Benitez

239.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set forth herein.

240.     Woodbridge SF and its affiliate Woodbridge Group have advantageous business relationships with (a) its customers who have benefited from earlier Woodbridge structured settlements and (b) prospective customers who have contacted Woodbridge via the Internet, telephone or due to referrals from other third parties regarding potential Woodbridge structured settlements.

241.     The Woodbridge Database has records, files and data for these Woodbridge customers and prospective customers.  Additionally, Woodbridge employees have gathered data from Woodbridge's third party vendors which supplements and confirms data directly collected from Woodbridge customers and prospective customers.

242.     Defendants Pina, Mays and Benitez have knowledge of Woodbridge's  customers and prospective customers via access to the Woodbridge Database and via Pina's actions.

243.     Defendants Pina, Mays and Benitez intentionally and without justification interfered with Woodbridge's relationships with Woodbridge customers and prospective customers.

244.     The use of the Woodbridge Database by Pina and Pina's referrals to Mays and Benitez was and is willful and malicious because Pina, Mays and Benitez willfully and maliciously used the Woodbridge Database and the data therein when they profited from the use of Woodbridge data and structured settlement referrals diverted to competitors.

245.     Woodbridge SF and Woodbridge Group have been damaged and have suffered losses due to these actions by Pina, Mays and Benitez.

246.     The amount of damage and loss cannot be reasonably ascertained.

247.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina and Mays and Benitez.

### Count 8: Intentional Interference with Prospective Economic Relationship under California Common Law by Pina, Mays and Benitez

248.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set forth herein.

249.     Woodbridge SF and its affiliate Woodbridge Group have advantageous prospective economic business relationships with (a) its customers who have participated in earlier Woodbridge structured settlements and (b) prospective customers who have contacted Woodbridge via the Internet, telephone or due to referrals from third parties regarding potential Woodbridge structured settlements.

250.     The Woodbridge Database has records, files and data for these Woodbridge customers and prospective customers.  Additionally, Woodbridge employees have gathered data from Woodbridge's third party data vendors which supplements and confirms data directly collected from Woodbridge customers and prospective customers.

251.     Defendants Pina, Mays and Benitez have knowledge of Woodbridge's customers and prospective customers via access to the Woodbridge Database and via Pina's actions.

252.     Defendants Pina, Mays and Benitez intentionally and without justification interfered with the Woodbridge's relationships with its customers and prospective customers.

253.     Defendants Pina, Mays and Benitez engaged in wrongful conduct by violating statutes such as the CFAA, 18 U.S.C. § 1030 (Count 1); Florida's Computer Abuse and Data Recovery Act (CADRA), Fla. Stat. 668.801 (Count 2); California's Computer Crimes Act, Cal. Pen. Code § 502 (Count 3); the Federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1833 and 1836(b) (Count 4); Florida's Uniform Trade Secrets Act (Fl-USTA), Fla. Stat. 688.001 (Count 5); and California's Uniform Trade Secrets Act (CA-UTSA), Cal. Civ. Code 3426.1 (Count 6).

254.     Pina and Mays and Benitez engaged in wrongful conduct by defrauding Plaintiffs with the diversion of structured settlement deals for Woodbridge customers and prospective customers to its competitors.

255.     Pina made fraudulent misrepresentations to Woodbridge customers and Woodbridge prospective customers regarding who was funding the structured settlements.

256.     The use of the Woodbridge Database by Pina, Mays and Benitez to mine data about Woodbridge customers and prospective customers and Pina's diversion of business to Mays and Benitez and ultimately to Woodbridge competitors was and is willful and malicious. Pina, Mays and Benitez willfully and maliciously used the Woodbridge Database and the data therein when they profited from the use of Woodbridge data and diverted structured settlement deals to Woodbridge competitors.

257.     Woodbridge SF and Woodbridge Group have been damaged and have suffered losses due to these actions by Pina, Mays and Benitez.

258.     The amount of damage and loss cannot be reasonably ascertained.

259.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina and Mays and Benitez.

**Count 9: Florida Common Law Fraud by Pina**

260.      Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set forth herein.

261.     Pina made misrepresentations to Woodbridge customers and prospective customers regarding who was participating in the structured settlement transactions.

262.     Pina knew such misrepresentations were false.

263.     Pina intended that such misrepresentations would induce Woodbridge customers and prospective customers to act upon Pina's misrepresentations by diverting structured settlement business away from Woodbridge and to its competitors.

264.     These misrepresentations did induce Woodbridge customers and prospective customers to act on Pina's misrepresentations because structured settlement deals were diverted to Woodbridge competitors.

265.     The use of the Woodbridge Database by Pina to obtain data about Woodbridge customers and prospective customers and Pina's diversion of business to Benitez and Woodbridge competitors was and is willful and malicious.  Pina willfully and maliciously used the Woodbridge Database and the data therein when he profited from the use of Woodbridge data and the diverted structured settlement deals.

266.     Woodbridge SF and Woodbridge Group have been damaged and have suffered losses due to these actions by Pina.

267.     The amount of damage and loss cannot be reasonably ascertained.

268.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina.

## Count 10:  California Common Law Fraud by Pina

269.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set forth herein.

270.     Pina made misrepresentations to Woodbridge customers and, upon information and belief, to Woodbridge prospective customers regarding who was participating in the structured settlement transactions.

271.     Pina knew such misrepresentations were false.

272.     Pina intended that these misrepresentations would induce Woodbridge customers and prospective customers to act upon Pina's misrepresentations by diverting structured settlement business away from Woodbridge and to its competitors.

273.     These misrepresentations did induce Woodbridge customers and prospective customers to act on Pina's misrepresentations because structured settlement deals were diverted to Woodbridge competitors.

274.     The use of the Woodbridge Database by Pina to obtain data about Woodbridge customers and prospective customers and Pina's diversion of business to Benitez and ultimately to Woodbridge competitors was and is willful and malicious. Pina willfully and maliciously used the Woodbridge Database and the data therein when he profited from the use of Woodbridge data and the diversion of structured settlement deals to Woodbridge competitors.

275.     Woodbridge SF and Woodbridge Group have been damaged and have suffered losses due to these actions by Pina.

276.     The amount of damage and loss cannot be reasonably ascertained.

277.     Woodbridge SF and Woodbridge Group have been irreparably harmed by these actions of Pina.

## Count 11: Pina's Breach of Agreements with Woodbridge SF
## and Woodbridge Group

278.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set

forth herein.

279.     Pina entered into a Florida Confidentiality, Noncompetition and Nonsolicitation

Agreement for Continuing Employees with Woodbridge SF.  See PX-01.

280.     Woodbridge SF has fulfilled all of its obligations under the Florida

Confidentiality, Noncompetition and Nonsolicitation Agreement for Continuing

Employees.

281.     Pina breached the Florida Confidentiality, Noncompetition and Nonsolicitation

Agreement for Continuing Employees as explained above. Pina used, for his own benefit,

confidential data and trade secrets from the Woodbridge Database.  He disclosed

confidential data and trade secrets from the Woodbridge Database to others and he

worked with Woodbridge competitors during his Woodbridge employment.  He induced

others to work with Woodbridge competitors during his Woodbridge employment. He

also breached the post-employment obligation of confidentiality; and he breached the

post-employment non-competition obligation.

282.     Pina entered into an agreement titled "Confidential Separation Agreement and

Release of All Claims" with Woodbridge Group (herein the "CS Agreement").  The CS

Agreement restated certain Pina obligations to Woodbridge Group affiliates, including

but not limited obligations to Woodbridge SF.  PX-02.

283.     Woodbridge Group has fulfilled all of its obligations under the CS Agreement.

49

284.     Woodbridge SF has fulfilled all of its obligations under the CS Agreement and the

Florida Confidentiality, Noncompetition and Nonsolicitation Agreement for Continuing

Employees.

285.     Pina has breached the CS Agreement as stated earlier.  After Pina resigned, he

used, for his own benefit, confidential data and trade secrets from the Woodbridge

Database and he disclosed confidential and trade secret data from the Woodbridge

Database to others.  He worked with Woodbridge competitors contrary to his post-

employment obligations.  He induced others who worked with Woodbridge to end their

Woodbridge employment.  He breached the post-employment obligation of

confidentiality.  He breached the post-employment non-competition obligation.

286.     Woodbridge SF and Woodbridge Group have been damaged, have suffered

losses, and have incurred losses in connection with Pina's breach of these agreements.


**Count 12:  Mays' Breach of Agreement with Woodbridge SF**


287.     Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set

forth herein.

288.     Mays entered into a California Confidentiality and Nondisclosure Agreement for

Continuing Employees with Woodbridge SF.

289.     Woodbridge SF has fulfilled all of its obligations under the California

Confidentiality and Nondisclosure Agreement for Continuing Employees.

290.     Mays has breached the California Confidentiality and Nondisclosure Agreement

for Continuing Employees as stated above.  Mays used, for his own benefit confidential

data and trade secrets  from the Woodbridge Database.  He disclosed confidential and

trade secret data from the Woodbridge Database to others.  He worked with Woodbridge

competitors during his Woodbridge employment.  He induced others to work with

Woodbridge competitors during his Woodbridge employment.  He breached the post-

employment obligation of confidentiality.  He breached the post-employment non-

competition obligation.

291.     Woodbridge SF and its affiliated company, Woodbridge Group, have been

damaged, have suffered losses, and have incurred losses in connection with Pina's breach

of these agreements.


### Count 13:  Benitez' Breach of Agreements with Woodbridge SF


292.      Plaintiffs repeat the allegations of the above paragraphs 1 – 140 as if fully set

forth herein.

293.     Benitez entered into a Confidentiality, NonCompetition and NonSolicitation

Agreement with Woodbridge SF.

294.     Woodbridge SF has fulfilled all of its obligations under the Confidentiality,

NonCompetition and NonSolicitation Agreement.

295.     Benitez has breached the Confidentiality, NonCompetition and NonSolicitation

Agreement as stated earlier.  Benitez used, for his own benefit confidential data and trade

secrets from the Woodbridge Database.  He disclosed confidential data and trade secrets

from the Woodbridge Database to others.  He induced other Woodbridge employees to

work with Woodbridge competitors.  He breached the post-employment obligation of confidentiality.  He breached the post-employment non-competition obligation.

296.     Benitez  entered into an agreement titled "Woodbridge Structured Funding LLC Termination and Nonsolicitation Agreement" with Woodbridge SF. This Agreement restated certain Benitez obligations to Woodbridge SF under the Confidentiality, NonCompetition and NonSolilcitation Agreement.

297.     Woodbridge SF has fulfilled all of its obligations under the Woodbridge Structured Funding LLC Termination and Nonsolicitation Agreement.

298.     Benitez has breached the Woodbridge Structured Funding LLC Termination and Nonsolicitation Agreement as stated earlier.  After Benitez resigned, he used, for his own benefit confidential data and trade secrets from the Woodbridge Database.  He disclosed confidential data and trade secrets from the Woodbridge Database to others.  He induced others who worked with Woodbridge to end their Woodbridge employment.  He breached the post-employment obligation of confidentiality.  He breached the post-employment non-competition obligation.

299.     Woodbridge SF and its affiliate Woodbridge Group have been damaged, have suffered losses, and have incurred losses in connection with Benitez' breach of these agreements.

## PRAYER FOR RELIEF

WHEREFORE, Woodbridge demands judgment on all Counts of this Complaint and an award of equitable relief and monetary relief, jointly and severally, against Defendants as follows:

a.  Entry of preliminary and permanent injunctions pursuant to Federal Rule

Civil Procedure 65 enjoining Defendants, their agents, representatives,

servants, employees, and all those acting in concert or participation therewith,

from:

(i)     directly or indirectly accessing, using, disclosing, or making available

to any person or entity, any of Woodbridge SF' and/or Woodbridge

Group's confidential, proprietary, or trade secret documents, data or

information, including but not limited to, Woodbridge customer data,

Woodbridge database data, Woodbridge investor data and/or accessing

Woodbridge SF and/or Woodbridge Group's accounts provided by

third party vendors or contractors;

(ii)    directly or indirectly violating the confidentiality obligations in their

agreements with Woodbridge SF and/or Woodbridge Group;

(iii)   directly or indirectly, soliciting,  initiating contact with, or accepting

business from, any Woodbridge SF and/or Woodbridge Group

customers or clients whose accounts were assigned to them while they

were employed by Woodbridge SF and/or Woodbridge Group;

(iv)    directly or indirectly soliciting, interfering or inducing others to solicit

or interfere with Woodbridge SF and/or Woodbridge Group customers

or clients;

(v)     directly or indirectly interfering or inducing others to interfere with

Woodbridge SF and/or Woodbridge Group consultants, contractors or

third parties, including but not limited to Woodbridge investors;

(vi)     directly or indirectly engaging in competitive activities with respect to Woodbridge SF and/or Woodbridge Group involving in any manner the use, communication, publication, disclosure, divulgation, or the authorization to any third party to communicate, publish, disclose, divulge or use, for their benefit or the benefit of such third party any Woodbridge SF and/or Woodbridge Group confidential information or trade secret;

b.   That Woodbridge be awarded damages and attorneys fees pursuant to the Federal Computer Fraud and Abuse Act (CFAA), 18 U.S.C. sec. 1030;

c.   That Woodbridge be awarded damages and attorneys fees pursuant to Florida's Computer Abuse and Data Recovery Act (CADRA), Fla. Stat. 668.801, et seq.;

d.   That Woodbridge be awarded damages and attorneys fees pursuant to California's Computer Crimes Act, Cal. Pen. Code sec. 502, et seq.;

e.   That Woodbridge be awarded damages and attorneys fees pursuant to the Federal Defend Trade Secrets Act (DTSA), 18 U.S.C. sec. 1833 and 1836(b);

f.   That Woodbridge be awarded damages and attorneys fees pursuant to Florida's Uniform Trade Secrets Act (Fl-USTA), Fla. Stat. 688.001, et seq.;

g.   That Woodbridge be awarded damages and attorneys fees pursuant to California's Uniform Trade Secrets Act (CA-UTSA), Cal. Civ. Code 3426.1, et seq.;

h.   That the damages under FL-USTA and CA-USTA be enhanced due to Defendants malicious and willful acts;

54

i.   That Woodbridge be awarded damages due to Defendants' Tortious Interference with Advantageous Business Relationship under Florida Common Law;

j.   That Woodbridge be awarded damages due to Defendants' Intentional Interference with Prospective Economic Relationship under California Common Law;

k.   That Woodbridge be awarded damages due to Pina's fraudulent actions under Florida and California law;

l.   That Woodbridge be awarded damages due to Pina's Breach of his Agreements with Woodbridge SF and Woodbridge Group;

m.   That Woodbridge be awarded damages due to Mays' Breach of his Agreement with Woodbridge SF;

n.    That Woodbridge be awarded damages due to Benitez' Breach of his Agreements with Woodbridge SF;

o.   That Woodbridge be awarded punitive damages due to Defendants' tortious interference with prospective business relationships and fraudulent acts;

p.   Entry of an award of pre-judgment interest on the judgment amount; and

q.   Entry of an Order for any further relief as the Court may deem just and proper.

PLAINTIFFS DEMAND A JURY TRIAL.

DATED: __Aug. 10, 2016.                                    Respectfully submitted,

                                                          Kain Spielman, P.A.

                                                          By: /s/*RobertKain*
                                                          Robert C. Kain, Jr.
                                                          Florida Bar No. 266760

rkain@complexip.com
Darren Spielman
Florida Bar No.010868
dspielman@complexip.com
Kain Spielman, P.A.
900 S.E. Third Avenue, Suite 205
Fort Lauderdale, FL 33316
Telephone: 954-768-9002
Facsimile: 954-768-0158
Attorneys for Plaintiffs

## VERIFICATION

Under penalty of perjury under the laws of the United States of America and the State of Florida, I declare that I have read the foregoing, that the facts alleged therein are true and correct to the best of my knowledge and belief, that the facts are based upon my personal knowledge or with respect to allegations of which I do not have personal knowledge, I believe them to be true based on specific information, documents, or both. I understand that a false statement in this Verification will subject me to penalties of perjury.

/s/ _____

Print name: Bibiana Farrington

Title: Director of Client Management

WOODBRIDGE STRUCTURED FUNDING, LLC.

/s/ _____

Print name: Bibiana Farrington

Title: Director of Client Management

WOODBRIDGE GROUP
OF COMPANIES, LLC